**WILLIAMS et al.**

v.

**CENTRAL OF GEORGIA RY. CO. et al.**

**Civ. A. No. 1080.**

United States District Court
M. D. Georgia, Macon Division.

Aug. 4, 1954.

E. S. Sell, Jr., Macon, Ga., for plaintiffs.

Benning M. Grice, Macon, Ga., A. R. Lawton and John B. Miller, Savannah, Ga., for defendants.

BOOTLE, District Judge.

The plaintiffs are thirteen white employees of the Central of Georgia Railway Company. The defendants are Central of Georgia Railway Company, the Brotherhood of Locomotive Firemen and Enginemen, hereinafter referred to as the Brotherhood, a national unincorporated association whose membership consists in chief part of the locomotive firemen and enginemen employed on various railroads engaged in interstate commerce, including the defendant Railway Company, and also three members of the Executive Committee of said Brotherhood as representatives of the entire membership as a class under Rule 23(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiffs allege that the Brotherhood members constitute the majority of the craft or class of locomotive firemen on the defendant Railway Company and that the Brotherhood has acted as sole bargaining agent and representative of the entire class of locomotive firemen, including those in the category to which plaintiffs claim to belong; that as such agent the Brotherhood negotiated with defendant Railway Company an agreement effective December 1, 1944, as to rates of pay, rules and conditions of employment for all members of said class or craft, a portion of said agreement, Article 26 thereof, dealing with "seniority, mileage and promotion" being attached to the petition as Exhibit A; that said Brotherhood together with Defendant Railway Company jointly procured the decree of this Court in Civil Action No. 711, that being a complaint somewhat similar to this one, the plaintiffs there being Curtis H. Washington et al. and the defendants being the same Railway Company and the same Brotherhood named as defendants in this case and some individual members of the Brotherhood named as representatives of the membership of all the subordinate lodges and of the Brotherhood itself as a class under said Rule 23(a) (The particular contractual provisions under fire in the Washington case were Sections 1 and 2 of an agreement effective February 22, 1941, reading as follows: "(1) On each railroad party hereto the proportion of nonpromotable firemen, and helpers on other than steam power, shall not exceed 50 per cent in each class of service established as such on each individual carrier. This agreement does not sanction the employment of nonpromotable men on any seniority district on which nonpromotable men are not now employed. (2) The above percentage shall be reached as follows: (a) Until such percentage is reached on any seniority district only promotable men will be hired. (b) Until such percentage is reached on any seniority district all new runs and all vacancies created by death, dismissal, resignation or disqualification shall be filled by promotable men. A change in the starting time of the same run or job will not be considered as constituting a new run." These provisions were carried forward in substance into the agreement effective December 1, 1944.); that the Brotherhood did not fairly and equitably bargain or act for (or) in behalf of all members of the class or craft affected by such negotiations and in so dealing with the defendant railroad and other railroads the Brotherhood did not perform and failed to discharge its lawful duty, obligation, and trust to protect equally the interest of all persons affected by its negotiations; that instead and in violation of the law the Brother-

hood acted exclusively for the benefit of and in the interest of its members and discriminated against these plaintiffs and deprived them of their right to work on fair and equal terms with negro locomotive firemen and with members of the Brotherhood. The complaint nowhere alleges specifically whether or not the plaintiffs are or ever were members of the Brotherhood. The above mentioned allegations rather indicate that at the time of the matters complained of, plaintiffs did not so belong.

The complaint alleges further that by a consent decree in said Civil Action No. 711, the Defendant Railway Company and the defendant Brotherhood were permanently enjoined from enforcing practices or agreements in so far as they discriminated against negro firemen in their employment as firemen on steam locomotives or from denying to the negro firemen, plaintiffs in said case, or to other members of their class their respective rights to assignments as firemen on steam locomotives or as helpers on diesel locomotives based upon seniority and qualifications because they are negroes or because they have not been permitted or required to take or pass examinations to qualify as engineers and that said decree further restrained the Brotherhood and Railway Company from requiring negro firemen to take or pass examinations to qualify as engineers as a condition of their continued employment or continued enjoyment of their seniority rights as firemen on steam locomotives or as helpers on diesel locomotives. The complaint prayed reference to the proceedings in said Civil Action No. 711, and reference thereto shows that the pertinent portion of said consent decree is as follows:

"That the Defendant Central of Georgia Railway Company and the Defendant Brotherhood of Locomotive Firemen and Enginemen as representative of the negro firemen on said Railway Company, their officers, agents and employees and all persons in active concert or participation with them are hereby permanently restrained and enjoined

"(a) from enforcing the Southeastern Carriers Conference agreement of February 18, 1941, or any other written or oral agreements, or carrying on any practices under such agreements, in so far as said agreements or practices discriminate, on the ground of their race or color, against negro firemen in their employment or occupation as firemen on steam locomotives or as helpers on diesel locomotives, or

"(b) from denying to Plaintiffs or other members of their class their respective rights to assignments as firemen on steam locomotives or as helpers on diesel locomotives based upon seniority and qualifications because they are negroes or because they have not been permitted or required to take or pass examinations to qualify as engineers, or

"(c) from requiring or compelling them to take or pass examinations to qualify as engineers as a condition of their continued employment or continued enjoyment of their seniority rights as firemen on steam locomotives or as helpers on diesel locomotives."

The most pertinent portions of the contract effective December 1, 1944, and the portions against which the complaint is particularly directed are Sections 10 (a), 10(b), and 10(c) which provide as follows:

"Section 10. (a) Firemen will be required to take examinations testing their qualifications for promotion as follows: All persons hereafter hired as firemen shall be required, in addition to showing, in the opinion of the Management, reasonable proficiency, to take within stated periods to be fixed by Management, but in no event to extend over a period of more than three years, two examinations to be prepared by Management and to be applied to all alike to test their qual-

ifications as firemen. A fireman failing to pass either examination shall have a second trial within three months.

"(b) Firemen hereafter hired declining to take or failing to pass either of the examinations provided for in the proceeding paragraph shall be dropped from the service.

"(c) Promotable firemen who pass the two examinations above referred to shall be required to take an examination for promotion to the position of engineer when they have had three and not more than four years of actual service. Upon passing such promotional examination and meeting all the requirements established by the carrier for the position of engineer, they shall when there is need for additional engineers, be promoted to such position, and will establish a seniority date as engineer in accordance with the rules contained in the agreement. It being understood that firemen who hold road and yard rights and pass yard engineers examination and fail the road engineers examination as provided herein shall lose all road rights and will thereafter be a yard man only."

Plaintiffs allege that the word "promotable" as used in the contract means "white" and that the word "nonpromotable" as used in the contract means negro, and they complain that the white firemen who passed the two examinations to test their proficiency as firemen are required to take an examination for promotion to the position of engineer and that by subsection (c) above quoted "firemen who hold road and yard rights and pass yard engineers examination and fail the road engineers examination as provided herein shall lose all road rights and will thereafter be a yard man only." They point out that the negro firemen are not permitted nor required to take the examination for promotion under the agreement and allege that said agreement was incorporated in the decree in Civil Action No. 711. They then allege that

all of the plaintiffs have taken the examination to determine their fitness as firemen and have passed the same, that all of them have taken examinations to qualify as yard engineers and have passed the same, that all plaintiffs except Taylor and Franklin have taken the examination to serve as road engineer and that all plaintiffs who took it have failed said examination. They say that in consequence all of the plaintiffs are restricted to yard service only and are not permitted to exercise their seniority rights as road firemen, that when there are insufficient places for plaintiffs as yard engineers, they are reduced to yard firemen and are serving as yard firemen accordingly. They allege that negro firemen with less seniority than plaintiffs are permitted to hold jobs as main line firemen while plaintiffs are not permitted to exercise their seniority rights as main line firemen, that the sole basis for distinction between the plaintiffs and the negro firemen is that under the consent decree in Civil Action No. 711, negro firemen are not permitted or required to take the examination for promotion to yard engineer and main line engineer while plaintiffs are so required. They allege that their fitness to serve as main line firemen has not been questioned and that nevertheless negro firemen with less seniority than plaintiffs are permitted to hold main line firing rights while plaintiffs are not. They allege that main line firing is more lucrative and occupies a higher seniority status than that of yard firemen, that plaintiffs are discriminated against because they are white persons, and that the said agreements were intended to and did operate to the serious injury of the plaintiffs and others similarly situated.

They allege that but for the conspiracy and unlawful practices and agreements of the Brotherhood and Railway Company, plaintiffs would have been permitted to revert to their positions as main line firemen when positions as yard engineer were no longer open and would have enjoyed the benefits of seniority and tenure as such main line firemen, but that

as a result of the unlawful conspiracy, practices and agreements, plaintiffs and other white firemen have been deprived of their employment and have been denied such benefits and that their property rights and tenure of employment have been destroyed in violation of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and the Constitution of the United States. They allege that the unlawful discrimination against them and the deprivation of their seniority rights as firemen arises solely from their race and from the fact that they are white firemen and classified as promotable firemen. They allege that the unlawful practices and agreements of the defendants are continuing and are causing injury and damage to plaintiffs and that the continued exclusion of plaintiffs from their proper positions aggravates and increases their damage and injury with the passage of time, that they have no adequate remedy at law, and that unless this Court grants the relief prayed for they will be irreparably damaged. They say they cannot allege the exact amount of their damages, which should be measured by the difference between what they actually earned on the jobs which they have held and the jobs which they are entitled to hold according to their seniority. They say that the records showing such information are exclusively in the custody of the defendant Railway Company, but they aver that their damages amount to $100,000 or other large sum.

The prayers of the petition are (a) that this Court take jurisdiction, determine the rights of the parties, and enter judgment declaring that the practices and agreements complained of are null and void in so far as they deprive plaintiffs of seniority and employment rights over those having less seniority and declaring their main line firing rights and that they be restored thereto and assigned to such runs as their seniority rights would entitle them but for the unlawful agreements and practices thereunder (b) for a permanent injunction enjoining the defendants, their officers, agents, servants, employees, attorneys and all persons in active concert or participation with them from taking any action which would have any similar discriminatory or unlawful effect (c) for a judgment ordering defendants to restore plaintiffs and other similarly situated and who may intervene herein to their positions from which they were wrongfully and unlawfully displaced and that their seniority rights and their employment rights be reinstated (d) for a permanent injunction against the Brotherhood, its officers, agents, servants, employees, attorneys and subordinate lodges and all persons in active concert or participation, enjoining them from purporting to act as a representative of the class or craft of locomotive firemen so long as the Brotherhood shall not represent or act fairly on behalf of all locomotive firemen, including plaintiffs, or shall discriminate against them in matters relating to wages, seniority, tenure, or other conditions of employment (e) for judgment for damages (f) for judgment for reasonable attorneys fees and (g) for such other relief as to the Court shall seem proper.

The only question before the Court at this time is that raised by the motion of the Brotherhood and the individual defendants E. H. Bennett, A. B. Healan, and G. E. Sherwood, members of the General Committee of said Brotherhood, "to dismiss the action on the ground that the Court lacks jurisdiction because it appears from the allegations of the complaint that the claim involves a dispute between the plaintiffs and the defendants growing out of the interpretation and application of an agreement concerning rates of pay, rules and working conditions within the provisions of the Railway Labor Act, Section 3 [subd. 1] (i), (U.S.C.A., Title 45, § 153 [subd. 1] (i)); and that under the provisions of the aforesaid act the National Railroad Adjustment Board has exclusive primary jurisdiction over this claim and this honorable Court has none."

This motion has been heard on oral arguments supported by written briefs. Movants rely upon such cases as Order of Ry. Conductors of America v. Pitney,

326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318, Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, Colbert v. Brotherhood of R. R. Trainmen, 9 Cir., 206 F.2d 9, Spires v. Southern Ry. Co., 4 Cir., 204 F.2d 453, and Brotherhood of Locomotive Firemen and Enginemen v. Central of Georgia Ry. Co., 5 Cir., 199 F.2d 384.

The Pitney, Slocum, and Spires cases involve jurisdictional disputes and follow the two leading jurisdictional dispute cases, Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61, and General Committee of Adjustment of Brotherhood of Locomotive Engineers for the Missouri-K.-T. R. R. v. Missouri-K.-T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76. By "jurisdictional dispute" is meant "an asserted overlapping of the interests of two crafts. It necessitates a determination of the point where the authority of one craft ends and the other begins or of the zones where they have joint authority." General Committee v. Missouri-K.-T. R. Co., supra, 320 U.S. at page 334, 64 S.Ct. at page 151. In the Switchmen's Union case, the Court's opinion points out that Commissioner Eastman, the draftsman of the 1934 amendments to the Railway Labor Act, in explaining the bill at the congressional hearings, stated that whether one organization or another was the proper representative of a particular group of employees was " 'one of the most controversial questions in connection with labor organization matters.' " [320 U.S. 297, 64 S.Ct. 98.] The precise holding in the Switchmen's Union case is that the courts are without jurisdiction to review the action of the National Mediation Board in issuing its certification of representatives for collective bargaining. The precise holding in the case of General Committee v. Missouri-K.-T. R. Co. is that where two labor organizations each claim exclusive bargaining rights with a railway company as to demotion of engineers and promotion of firemen to emergency work, the issues tendered "are not justiciable—that is to say that

Congress by this Act [Railway Labor Act] has foreclosed resort to the courts for enforcement of the claims asserted by the parties."

The Pitney case involved another typical jurisdictional dispute, whether certain trains should be manned by "yard conductors" or "road conductors." The Supreme Court said [326 U.S. 561, 66 S.Ct. 325]: "We have seen that in order to reach a final decision on that question the court first had to interpret the terms of O.R.C.'s collective bargaining agreements. The record shows, however, that interpretation of these contracts involves more than the mere construction of a 'document' in terms of the ordinary meaning of words and their position. * * * For O.R.C.'s agreements with the railroad must be read in the light of others between the railroad and B.R.T. And since all parties seek to support their particular interpretation of these agreements by evidence as to usage, practice and custom that too must be taken into account and properly understood. The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress." Then the Court did not hold that the courts are powerless to adjudicate the controversy or to interpret the contracts but held "under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the extraordinary relief of an injunction should be withheld, at least, until then. * * * Only after the Adjustment Board acts, but not until then, can it plainly appear that such relief is necessary to insure compliance with the statute. Until such time, O.R.C. can not show irreparable loss and inadequacy of the legal remedy. The court of equity should, therefore, in the exercise of its discretion stay its hand."

It may be pointed out that in the instant case there does not exist the necessity for interpretation so much emphasized in the Pitney case. All parties to the instant litigation know what the pro-

visions of the contract complained of mean. There is no dispute as to what the contract means. In oral argument, counsel for the plaintiffs stated that the meaning of the contract is "painfully clear."

In the Slocum case, there was another jurisdictional dispute between two labor organizations, each claiming for its members certain jobs with the railroad. The case originated in a state court of New York which granted a declaratory judgment. The Supreme Court of the United States reversed the state court's action, basing its decision largely upon the Pitney case. Both decisions were written by Mr. Justice Black. In the Slocum case, the decision does not say that the state court of New York should have "stay[ed] its hand." It says, "It was error for the New York courts to uphold a declaratory judgment interpreting these collective bargaining agreements." [339 U.S. 239, 70 S.Ct. 580.] In note 7, however, the Court states: "We are not confronted here with any disagreement or conflict in interest between an employee and his bargaining representative, as in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. Nor are we called upon to decide any question concerning judicial proceedings to review board action or inaction." From this note 7, Mr. Justice Reed, in his dissent, takes it that "the Court means only to hold that the Board has what might be called exclusive primary jurisdiction and that the decision is to have no implications for later cases which might pose the issue of judicial review of Board 'action or inaction.'" Mr. Justice Reed then stated that the obligation recognized in the Pitney case to send the controversy to the Board was no more universal than the obligation of an equity court to sometimes remit parties to the state courts for a preliminary decision on state law, citing Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480, and Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9.

The Slocum case distinguishes itself from the instant case in that their interpretation of the agreements of the two labor organizations was required, and by note 7 the writer of the opinion was careful to say: "We are not confronted here with any disagreement or conflict in interest between an employee and his bargaining representative, as in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. * * * "

The Spires case presents the picture of two labor organizations fighting over the right to man a certain freight train, another jurisdictional dispute. Chief Judge Parker, writing for the Court, said that jurisdiction lay with the Adjustment Board and not with the courts. He carefully distinguished that case from the Steele case and from the case of Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283, by saying, " * * * but both of those cases dealt with racial discrimination, as to which the courts were well qualified to grant relief and which involved none of the matters of collective bargaining which the Adjustment Board was set up to handle." [204 F.2d 456.]

The Colbert case from the Ninth Circuit is somewhat similar to, but essentially different from, the instant case, as shown by the following quotations therefrom [206 F.2d 12]: "Appellants seek to present an analogous court case to those considered and discussed in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood, etc., 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, and Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283. But each of those cases, while involving minority personnel in railway operations, pertained to race discriminations alone, which in the words of the court 'are obviously irrelevant and invidious.' Here, however, except as to the latitudinal claim amounting to no more than a conclusion of law that the contractual differential relative to appellants' seniority in the P.E. is 'arbitrary, capricious and fraudulent,' there is no showing that the statutory representative of the craft to which appellants belonged when the questioned contract was made did not in good faith

effectuate the change in working conditions as of August 6, 1941 so as to bring the matter complained of within pronouncements of the Supreme Court in decisions under the Railway Labor Act and the principles and concomitants of collective bargaining as provided and infused therein."

Unlike the allegations of the complaint in the Colbert case, the plaintiffs here allege among other things that the defendant Brotherhood " * * * did not fairly and equitably bargain or act for (or) in behalf of all members of the class or craft affected by such negotiations, and in so dealing with the defendant Railroad and other railroads, the Brotherhood did not perform and failed to discharge its lawful duty, obligation and trust to protect equally the interest of all persons affected by its negotiations. Instead, and in violation of the law, the Brotherhood acted exclusively for the benefit of and in the interest of its members, and discriminated against these Plaintiffs and deprived them of their right to work on fair and equal terms with negro locomotive firemen and with members of the Brotherhood; and to that end, the Defendant Brotherhood negotiated and consummated with the Defendant railroad and other southeastern carriers a number of agreements including the agreement a portion of which is 'Exhibit A' to this complaint." (Paragraph 10.) "So it is that Plaintiffs aver that under the purported agreements hereinabove referred to Plaintiffs are discriminated against because they are white persons and the said agreements were intended to and did operate to the serious injury of the Plaintiffs and others similarly situated." (Paragraph 20.) "But for the conspiracy and unlawful practices and agreements of the Defendant Brotherhood and Defendant Railroad, Plaintiffs would have been permitted to revert to their positions as main line firemen when positions as yard engineer were no longer open and would have enjoyed the benefits of seniority and tenure as such main line firemen. However, as a result of the said unlawful conspiracy, practices and agreements, Plaintiffs and other white firemen have been deprived of their employment and have been denied such benefits and their property rights and their tenure of employment has been destroyed in violation of the Railway Labor Act and the Constitution of the United States." (Paragraph 24.) "The unlawful discrimination against these Plaintiffs and the deprivation of their seniority rights as firemen arises solely from their race and from the fact that they are white firemen and classified as promotable firemen." (Paragraph 25.)

In Brotherhood of Locomotive Firemen and Enginemen v. Central of Georgia Ry. Co., 5 Cir., 199 F.2d 384, 385, there is another dispute between two labor organizations. A 1946 tripartite agreement between the Engineers' Brotherhood, Firemen's Brotherhood, and the Railway Company established certain rules of employment. In 1948, a two-party agreement was accomplished between the Engineers' Brotherhood and the Railway Company. The Firemen's Brotherhood alleges that the latter agreement establishes rules inconsistent with the earlier tripartite agreement. The District Court refused to assume jurisdiction on the ground that an adequate administrative remedy was available before the National Railway Adjustment Board. The Court of Appeals affirmed, saying of the District Court's action, "This ruling was predicated upon the proposition that a disposition of the case on its merits would require the court to *interpret* a collective bargaining agreement, and that this was a subject over which the Adjustment Board had exclusive primary jurisdiction." (Emphasis supplied.)

In none of these cases relied upon by the movants was there involved any charge of racial discrimination, nor did any of these cases, except possibly the Colbert case, attack the validity of the bargaining agreement.

The plaintiffs rely upon such cases as Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, Tunstall v.

Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, Transcontinental and Western Air, Inc., v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325, Central of Georgia Ry. Co. v. Culpepper, 209 Ga. 844, 76 S.E.2d 482, and Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283.

In the Moore case, the Supreme Court apparently for the first time gave consideration to the question whether a railway employee could sue in a District Court of the United States without having gone first to the Railway Adjustment Board. Moore had been an employee of the defendant Railway Company and alleged that he had been wrongfully discharged contrary to the terms of a collective bargaining agreement. The defendant Railway contended that the suit "was prematurely brought because of his failure to exhaust the administrative remedies granted to him by the Railway Labor Act". [312 U.S. 630, 61 S.Ct. 756.] The Supreme Court said: "But we find nothing in that Act which purports to take away from the courts the jurisdiction to determine a controversy over a wrongful discharge or to make an administrative finding a prerequisite to filing a suit in court. In support of its contention, the railroad points especially to section 153(i), which, as amended in 1934, provides that disputes growing out of grievances or out of the interpretation or application of agreements 'shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.' * * * It is to be noted that the section pointed out, § 153(i), as amended in 1934, provides no more than that disputes 'may be referred * * * to the * * * Adjustment Board * * *.' It is significant that the comparable section of the 1926 Railway Labor Act (44 Stat. 577, 578), had, before the 1934 amendment, provided that upon failure of the parties to reach an adjustment a 'dispute shall be referred to the designated adjustment board by the parties, or by either party * * *.' Section 3(c). This difference in language, substituting 'may' for 'shall', was not, we think, an indication of a change in policy, but was instead a clarification of the law's original purpose. For neither the original 1926 Act, nor the Act as amended in 1934, indicates that the machinery provided for settling disputes was based on a philosophy of legal compulsion. On the contrary, the legislative history of the Railway Labor Act shows a consistent purpose on the part of Congress to establish and maintain a system for peaceful adjustment and mediation voluntary in its nature. The District Court and the Circuit Court of Appeals properly decided that petitioner was not required by the Railway Labor Act to seek adjustment of his controversy with the railroad as a prerequisite to suit for wrongful discharge."

The Steele case is strikingly similar to the instant case. There Mr. Chief Justice Stone stated the question as follows [323 U.S. 192, 65 S.Ct. 228]: "The question is whether the Railway Labor Act * * * imposes on a labor organization, acting by authority of the statute as the exclusive bargaining representative of a craft or class of railway employees, the duty to represent all the employees in the craft without discrimination because of their race, and, if so, whether the courts have jurisdiction to protect the minority of the craft or class from the violation of such obligation." Steele was a negro fireman. The Brotherhood of Locomotive Firemen and Enginemen was the exclusive bargaining representative of his craft. Because of his color, he was excluded from its membership. He alleged in substance that he and other colored firemen had been discriminated against by the Brotherhood in that the Brotherhood had, on February 18, 1941, entered into an agreement with the Railway Company which provided that not more than

50 per cent of the firemen in each class of service in each seniority district should be negroes. This is the same agreement which was successfully subjected to the same attack in the Washington case, *Civil Action No. 711, in this Court.* The Steele case originated in the state courts of Alabama and the Supreme Court of that state took jurisdiction but held that on the merits the contract stated no cause of action. The Supreme Court of the United States granted certiorari and reversed the decision of the Supreme Court of Alabama. The essence of the decision of the Supreme Court is that the Railway Labor Act imposes on the bargaining representative of a craft or class of employees "the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." 323 U.S. at page 203, 65 S.Ct. at page 232. The Court said: "Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences. Here the discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations. Cf. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Yu Cong Eng v. Trinidad, 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059; State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559.

"The representative which thus discriminates may be enjoined from so doing, and its members may be enjoined from taking the benefit of such discriminatory action. No more is the Railroad bound by or entitled to take the benefit of a contract which the bargaining representative is prohibited by the statute from making. In both cases the right asserted, which is derived from the duty imposed by the statute on the bargaining representative, is a federal right implied from the statute and the policy which it has adopted. It is the federal statute which condemns as unlawful the Brotherhood's conduct. 'The extent and nature of the legal consequences of this condemnation, though left by the statute to judicial determination, are nevertheless to be derived from it and the federal policy which it has adopted.' Deitrick v. Greaney, 309 U.S. 190, 200, 201, 60 S.Ct. 480, 485, 84 L.Ed. 694; Board of County Commissioners v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 177, 63 S.Ct. 172, 173, 174, 87 L.Ed. 165; cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838.

"So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft. While the statute does not deny to such a bargaining labor organization the right to determine eligibility to its membership, it does require the union, in collective bargaining and in making contracts with the carrier, to represent non-union or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith. Wherever necessary to that end, the union is required to consider requests of non-union members of the craft and expressions of their views with respect to collective bargaining with the employer and to give to them notice of and opportunity for hearing upon its proposed action.

"Since the right asserted by petitioner 'is * * * claimed * * * under the Constitution' and a 'statute of the United States', the decision of the Alabama court adverse to that contention is reviewable here under § 237(b) of the Judicial Code, 28 U.S.C.A. § 344(b), unless the Railway Labor Act itself has ex-

cluded petitioner's claims from judicial consideration. The question here presented is not one of a jurisdictional dispute, determinable under the administrative scheme set up by the Act, cf. Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95 [88 L.Ed. 61]; General Committee v. Missouri-K.-T. R. Co., 320 U.S. 323, 64 S.Ct. 146 [88 L.Ed. 76]; General Committee v. Southern Pacific Co., 320 U.S. 338, 64 S.Ct. 142 [88 L.Ed. 85]; Brotherhood of Railway & Steamship Clerks v. United Transport Service Employees, 320 U.S. 715, 64 S.Ct. 260 [88 L.Ed. 420]; Id., 320 U.S. 816, 64 S.Ct. 435 [88 L.Ed. 493], or restricted by the Act to voluntary settlement by recourse to the traditional implements of mediation, conciliation and arbitration. General Committee v. Missouri-K.-T. R. Co., supra, 320 U.S. [at pages] 332, 337, 64 S.Ct. [146] 150, 153. There is no question here of who is entitled to represent the craft, or who are members of it, issues which have been relegated for settlement to the Mediation Board, Switchmen's Union v. National Mediation Board, supra; General Committee v. Missouri-K.-T. R. Co., supra. Nor are there differences as to the interpretation of the contract which by the Act are committed to the jurisdiction of the Railroad Adjustment Board.

"Section 3, First (1), which provides for reference to the Adjustment Board of 'disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements', makes no reference to disputes between employees and their representative. Even though the dispute between the railroad and the petitioner were to be heard by the Adjustment Board, that Board could not give the entire relief here sought. The Adjustment Board has consistently declined in more than 400 cases to entertain grievance complaints by individual members of a craft represented by a labor organization. 'The only way that an individual may prevail is by taking his case to the union and causing the union to carry it through to the Board.' Administrative Procedure in Government Agencies, S.Doc. No. 10, 77th Cong., 1st Sess., Pt. 4, p. 7. Whether or not judicial power might be exerted to require the Adjustment Board to consider individual grievances, as to which we express no opinion, we cannot say that there is an administrative remedy available to petitioner or that resort to such proceedings in order to secure a possible administrative remedy, which is withheld or denied, is prerequisite to relief in equity. Further, since § 3, First (c), permits the national labor organizations chosen by the majority of the crafts to 'prescribe the rules under which the labor members of the Adjustment Board shall be selected' and to 'select such members and designate the division on which each member shall serve', the Negro firemen would be required to appear before a group which is in large part chosen by the respondents against whom their real complaint is made. In addition § 3, Second, provides that a carrier and a class or craft of employees, 'all acting through their representatives, selected in accordance with the provisions of this Act', may agree to the establishment of a regional board of adjustment for the purpose of adjusting disputes of the type which may be brought before the Adjustment Board. In this way the carrier and the representative against whom the Negro firemen have complained have power to supersede entirely the Adjustment Board's procedure and to create a tribunal of their own selection to interpret and apply the agreements now complained of to which they are the only parties. We cannot say that a hearing, if available, before either of these tribunals would constitute an adequate administrative remedy."

The Tunstall case follows Steele in all respects, the difference being that the Tunstall case originated in the federal courts which took jurisdiction under 28 U.S.C.A. § 41(8) now 28 U.S.C.A. § 1337.

The Koppal case is a suit for wrongful discharge essentially the same as the Moore case.

The case of Central of Georgia Ry. Co. v. Culpepper, 209 Ga. 844, 76 S.E.2d 482, is interesting because of its holding and because of the alignment of parties and counsel. There the Brotherhood of Locomotive Firemen and Enginemen, one of the defendants in this case, sued the Central of Georgia Railway Company, the other principal defendant in this case, to enjoin it from putting into effect certain plans relating to firing assignments on the railroad, which allegedly would violate a collective bargaining agreement between the Brotherhood and the Railway Company. The respective parties there each had the same distinguished counsel they have here. There the Railway Company contended that the Court did not have jurisdiction; the Brotherhood contended it did. The Court decided it had jurisdiction. Apparently the Railway Company became convinced of the error of its contention because it is not a party to the motion now being considered and does not question the jurisdiction of the Court in this case. Apparently the Brotherhood is dissatisfied with the fruits of its victory and the ruling it invoked because it now questions the jurisdiction of this Court and is the principal movant here.

The case of Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283, points up the difference between such cases as Slocum on the one hand and Steele on the other. Negro "train porters" sought injunctive relief against a contract entered into between the Brotherhood of Railroad Trainmen and a railroad which provided that "train porters" could no longer do the work of brakemen as they had been doing. The District Court held that there was involved both a representation question, of which the Mediation Board had exclusive jurisdiction, and a jurisdictional question, of which the National Railway Adjustment Board had exclusive jurisdiction, and further that since the "train porters" had their own union organization, the Brotherhood of Railroad Trainmen was under no duty to represent them. The Supreme Court held exactly the opposite and said: "The claims here cannot be resolved by interpretation of a bargaining agreement so as to give jurisdiction to the Adjustment Board under our holding in Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795. This dispute involves the *validity* of the contract, not its *meaning*. Nor does the dispute hinge on the proper craft classification of the porters so as to call for settlement by the National Mediation Board under our holding in Switchmen's Union [of North America] v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. For the contention here with which we agree is that the racial discrimination practiced is unlawful, whether colored employees are classified as 'train porters,' 'brakemen,' or something else. Our conclusion is that the District Court has jurisdiction and power to issue necessary injunctive orders notwithstanding the provisions of the Norris-LaGuardia Act." (Emphasis supplied.)

Clearly the dispute between the parties in the instant case, as in the Howard case, relates not to the meaning of the contract but to its validity.

Attention may be called to a few additional decisions. In Brotherhood of Railroad Trainmen v. Texas & Pacific R. Co., 5 Cir., 159 F.2d 822, 827, the plaintiff Railway Company sought a declaratory judgment, alleging that the bargaining agent was insisting that the plaintiff negotiate a change in the current agreement for yard operations and that some individual employees were demanding that the plaintiff refuse and threatening suit if plaintiff did not. The Court held that the statute compels negotiation and that inasmuch as the Brotherhood was the accredited representative, there was nothing before the Court for adjudication. The Court clearly distinguished such cases as those relied upon by movants from such cases as those relied upon by Plaintiffs and stated: "If, the negotiation completed, any of

the members have a *just ground of complaint* that the collective agreement is *not binding on them* for want of authority of the bargaining agent, it will not be binding on them or on the carriers, and they can, as Steele and Tunstall did, obtain relief from it. For, as was said in Steele's case: 'The representative which thus discriminates may be enjoined from so doing, and its members may be enjoined from taking the benefit of such discriminatory action. No more is the Railroad bound by or entitled to take the benefit of a contract which the bargaining representative is prohibited by the statute from making' ". (Emphasis supplied.)

Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 683, 97 L.Ed. 1048, presents a similar problem, although there the question arose under the comparable provisions of the National Labor Relations Act, 29 U.S.C.A. 151 et seq. There the Court sustained the validity of collective bargaining agreements whereby an employer in determining relative seniority of employment among its employees gives them credit for pre-employment military service as well as credit for post-employment military service required by statute. The labor organization questioned the jurisdiction of the District Court. In its opinion, the Supreme Court stated that the question of jurisdiction had not been argued in the Court of Appeals nor mentioned in its opinion and "in view of our position on the merits, it is not discussed here." Notwithstanding the fact that the Supreme Court did not discuss the question of jurisdiction, it must have decided it had jurisdiction because it upheld the validity of the contract and it upheld it because the Supreme Court, along with the District Court, was " 'of the opinion that the collective bargaining agreement expresses an honest desire for the protection of the interests of all members of the union and is not a device of hostility to veterans. The Court finds that said collective bargaining agreement sets up a seniority system which the Court deems not to be arbitrary, discriminatory or in any respect unlawful."

In Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 1291, 93 L.Ed. 1513, the Supreme Court held valid a collective bargaining agreement giving union chairmen top seniority in the event of layoffs. The Court was careful to note, however, that in all instances the bargaining representative must attempt in utmost good faith fairly to represent the entire craft. The Court stated: "All this presupposes, obviously, that an agreement containing the 1945 provisions expresses honest desires for the protection of the interests of all members of the union and is not a skillful device of hostility to veterans. There is not the remotest suggestion that the 1945 agreement was other than what it purported to be—the means for securing both to veterans and to nonveterans better working conditions through elected leaders not subject to the contingencies of a labor turnover."

Against the background of the foregoing decisions and under the law as thus enunciated, this Court under the motion now being considered is asked to dismiss this complaint not because it fails to set forth a cause of action entitling the plaintiffs to any of the relief sought and not because the complaint is without equity to support it. The present motion does not in any manner address itself to a consideration of the merits of the controversy. The motion is that this Court dismiss the action "on the ground that the Court lacks jurisdiction because it appears from the allegations of the complaint that the claim involves a dispute between the plaintiffs and the defendants growing out of the interpretation and application of an agreement concerning rates of pay, rules and working conditions within the provisions of the Railway Labor Act, Section 3 [subd 1] (i) (U.S.C.A., Title 45, § 153 [subd. 1] (i)); and that under the provisions of the aforesaid Act, the National Railroad Adjustment Board has

exclusive primary jurisdiction over this claim and this honorable Court has none."

Testing the allegations of the complaint against the specific aim of this motion, the Court is of the opinion that the motion will have to be overruled and denied. This ruling does not pass upon any question except the specific question raised by the motion. The merits of the cause, of course, have not been argued or considered. The questions whether or not the plaintiffs are entitled to equitable relief or whether the complaint sets out a cause of action have not been argued or considered. The problems of proof have not been reached. Here we have the novel situation of alleged racial discrimination within one race. Nevertheless we are dealing for a limited purpose only with the allegations of the complaint, and it alleges unlawful racial discrimination. This ruling means no more than that if the complainants are entitled to complain, if they have a cause of action, it may be asserted in this Court without requiring that they go first to the National Railway Adjustment Board. Indeed in view of the statements contained in the opinion of the Supreme Court in the Moore case, it may well be doubted whether they would receive a hearing before the National Railway Adjustment Board unless they could persuade their bargaining representative, named as a defendant herein, to sponsor their cause.

As was said by the Supreme Court of Georgia in the case of Central of Georgia Ry. Co. v. Culpepper, supra [209 Ga. 844, 76 S.E.2d 485], "We, of course, consider the case as it comes to us. * * * Whether or not the court below had jurisdiction is, of course, a different question from whether or not the petition sets out a cause of action, since a court having jurisdiction does not have jurisdiction only of good causes but also of bad causes."

Accordingly, the said motion is hereby denied and overruled.