**H. M. WILLIAMS et al., Plaintiffs,**

v.

**CENTRAL OF GEORGIA RAILWAY CO., Brotherhood of Locomotive Firemen and Enginemen, et al., Defendants.**

Civ. A. No. 1080.

United States District Court
M. D. Georgia,
Macon Division.
Dec. 20, 1955.

Carlton Mobley, Lewis & Sell, Macon, Ga., for plaintiffs.

Benning M. Grice, Macon, Ga., Harold C. Heiss, Russell B. Day, Cleveland, Ohio, Julian C. Sipple, Savannah, Ga., for defendants.

BOOTLE, District Judge.

These thirteen plaintiffs, white firemen, bring this class action against their employer, Central of Georgia Railway Company, their Railway Labor Act, 45 U.S.C.A. § 151 et seq., bargaining representative, The Brotherhood of Locomotive Firemen and Enginemen, and three of the latter's officers, seeking damages and equitable relief, claiming that certain collective bargaining agreements entered into between the carrier and the Brotherhood are unlawful in that in negotiating the said contracts the Brotherhood did not fairly and equitably bargain and act for, or on behalf of, all members of the class or craft of locomotive firemen affected by the negotiations and did not discharge its lawful duty, obligation and trust equally to protect the interests of all persons affected by the negotiations, but, on the contrary, acted exclusively for its own members and discriminated against these plaintiffs, depriving them of their right to work on fair and equal terms with Negro locomotive firemen and with members of the Brotherhood. All of the defendants deny the alleged discrimination and say that the agreements were entered into in good faith and are valid. The defendants set up also the defenses of laches, the statute of limitations, a contractual time limitation, acquiescence and failure to exhaust Brotherhood appeal remedies. The Brotherhood defendants also filed a motion to dismiss for lack of jurisdiction, asserting that the National Railroad Adjustment Board has exclusive primary jurisdiction, which motion was heard and overruled, as reported in Williams v. Central of Georgia Ry. Co., D.C.M.D. Ga.1954, 124 F.Supp. 164. The case then came on for trial on the merits, the trial being limited to the issue of liability vel non and to whether or not the plaintiffs are entitled to injunctive relief, the question of damages, if any, being reserved for further testimony should the question of liability be resolved in plaintiffs' favor.

The evidence shows that the Brotherhood and the carrier, through the collective bargaining process, entered into agreements effective as follows: February 16, 1938, December 1, 1944, and January 1, 1954. They were involved also in a compromise decree of this court, entered by Judge A. B. Conger, on March 25, 1952, in Civil Action No. 711, sometimes known as the "Curtis Washington case".

The gravamen of complainants' case is alleged discrimination as a result of a contractual provision which, as of the date of the filing of this action on Oc-

tober 12, 1953, found its expression in Section 10(c) of the agreement effective December 1, 1944. Section 10(a), (b) and (c) reads as follows, the portion against which complainants particularly complain being herein italicized:

"Section 10. (a) Firemen will be required to take examinations testing their qualifications for promotion as follows: All persons hereafter hired as firemen shall be required, in addition to showing, in the opinion of the Management, reasonable proficiency, to take within stated periods to be fixed by Management, but in no event to extend over a period of more than three years, two examinations to be prepared by Management and to be applied to all alike to test their qualifications as firemen. A fireman failing to pass either examination shall have a second trial within three months.

"(b) Firemen hereafter hired declining to take or failing to pass either of the examinations provided for in the proceeding (sic) paragraph shall be dropped from the service.

"(c) Promotable firemen who pass the two examinations above referred to shall be required to take an examination for promotion to the position of engineer when they have had three and not more than four years of actual service. Upon passing such promotional examination and meeting all the requirements established by the carrier for the position of engineer, they shall when there is need for additional engineers, be promoted to such position, and will establish a seniority date as engineer in accordance with the rules contained in the agreement. *It being understood that firemen who hold road and yard rights and pass yard engineers examination and fail the road engineers examination as provided herein shall lose all road rights and will thereafter be a yard man only."*

The history of that allegedly objectionable provision is material. The 1938 agreement did not require firemen to stand promotional examinations for engineers and, of course, did not provide any such penalty for refusal to take, or failure to pass, the examinations. The 1938 agreement is relevant here only historically. On February 18, 1941, this carrier and a number of other carriers and the Brotherhood entered into an agreement, commonly known as the Southeastern Carriers Conference Agreement, or the "Washington Agreement", effective February 22, 1941, which agreement, among other things, (1) restricted the non-promotable firemen (Negro firemen have traditionally been regarded as non-promotable to the position of engineer) in the exercise of their seniority to not more than fifty per cent of the runs on each class of service of each of the carriers, and (2) required that all other persons thereafter employed as firemen take promotional examinations to engineer in accordance with their standing on the firemen's roster subject to the penalty that if they declined to take, or failed to pass, such examinations they were to be dismissed from further service on the railroad. These provisions were from that date continued in full force and effect until they were later incorporated into the 1944 agreement. The 1944 agreement was a new printing of the Firemen's Collective Bargaining Agreement with the carrier and included in it was the substance of the February, 1941 forced promotion rule constituting Article 26, Section 10 thereof, the pertinent portions of which are quoted above. It will be noted that the 1941 agreement provided that firemen refusing to take, or failing to pass, the examinations would be dismissed from service and that the 1944 agreement provided that firemen "hereafter" hired and declining to take, or failing to pass, the examinations would likewise be dismissed from serv-

ice. During the interval between the 1941 and 1944 agreements a considerable number of firemen refusing to take, or failing to pass, the examinations were dismissed from the service. It was not until the 1944 agreement that the penalty of dismissal for refusal to take, or failure to pass, the examinations was minimized to restriction to yard service only rather than dismissal from the service. Were it not for the amelioration provided by the 1944 agreement, the provisions of the 1941 agreement would have called for the dismissal or discharge of all of the thirteen plaintiffs. The dismissal provision of the 1941 agreement antedated the employment of all of the plaintiffs except H. M. Williams, T. O. Barr and J. F. Kelley.

The dates of original employment of the respective plaintiffs by the carrier are as follows: Williams, 1937; Lott, 1943; Dooley, 1943; Lee, 1943; Taylor, 1943; Franklin, 1943; Lowery, 1944; Barr, 1941; Kelley, 1940; Barefield, 1943; Joiner, 1943; Biles, 1941; and Bateman, 1944. All of the thirteen plaintiffs, except Taylor and Franklin, failed to pass the promotional examination to engineer, and those two chose not to take it. Accordingly, all thirteen were restricted to yard service. The dates of restriction are as follows: Williams, 1945; Lott, 1948; Dooley, 1950; Lee, 1949; Taylor, 1948; Lowery, 1941; Barr, 1945; Barefield, 1947; Joiner, 1947; Kelley, 1944; Biles, 1948; and Bateman, 1953.

The 1944 agreement provides that when reduction in traffic requires fewer engineers they will be demoted in accordance with seniority, and they may displace firemen their juniors (Article 26, Section 1(a)). The right to yard firing is in accordance with seniority appearing on the yard firing rosters (Section 9(a)).

As a result of the penalty provision, the plaintiffs are restricted to yard service and are not permitted to exercise seniority rights as road firemen. They are permitted to serve as yard firemen and as yard engineers. Service as yard engineers is in accordance with yard engineer seniority on that particular roster under the agreements, and plaintiffs make no complaint as to their service as such.

Some Negro firemen are serving as road firemen having less road firing seniority than do some of the plaintiffs. Also, there are some white firemen so serving as road firemen while junior to some of the plaintiffs. The plaintiffs' fitness to serve as road firemen in the narrow meaning of that term, and without reference to their inability to become road engineers, has not been questioned by the carrier. Road firing in general is more lucrative and is, therefore, more desirable than yard firing, although it entails expenses of maintenance for time spent away from home. Seniority rights of firemen are valued rights, and by and large all of these plaintiffs depend upon their employment for their livelihood.

The Brotherhood, on January 26, 1948, after the courts had stricken down at the instance of Negro firemen the provisions of the 1941 agreement aimed discriminatorily at them, Brotherhood of Locomotive Firemen and Enginemen v. Tunstall, 4 Cir., 1947, 163 F.2d 289, served formal notice on this carrier of its desire to negotiate and consummate a change in the existing agreement so as to require that all firemen, promotable and non-promotable (white and Negro), take the promotional examination to engineer. If this had been adopted the penalty would be dismissal from service of Negroes and whites alike. Negotiations were conducted, but were stopped by reason of litigation pending elsewhere. Brotherhood of Locomotive Firemen and Enginemen v. Palmer, 1949, 85 U.S.App. D.C. 429, 178 F.2d 722. In the Palmer case, an injunction was issued on April 28, 1948, by the District Court of the District of Columbia against this Brotherhood, enjoining it from further processing, not only on this carrier but on other southeastern carriers, this move-

ment to apply the forced promotion rule and its consequences to both Negroes and whites. See also Hinton v. Seaboard Air Line R. Co., 4 Cir., 1948, 170 F.2d 892, and Rolax v. Atlantic Coast Line R. Co., 4 Cir., 1951, 186 F.2d 473.

On December 12, 1949, certain Negro firemen employees, including Curtis H. Washington, filed their action against this carrier and the Brotherhood, complaining that their seniority rights had been violated by the percentage feature contained in the Southeastern Carriers Conference Agreement of 1941, and seeking equitable relief and damages. On March 25, 1952, Judge A. B. Conger, of this court, signed a final decree enjoining said defendants from denying to the plaintiffs their rights to assignments as firemen because they were Negroes or because they had not been permitted or required to take or pass promotional examinations to engineer and restraining said defendants also from requiring such Negro firemen to take such examinations to qualify as engineers as a condition of their continued employment, or continued enjoyment of their seniority rights as firemen. Thus, the decree continued the 1944 agreement provision exempting Negroes from forced promotional examinations to engineer and from any penalty for failure to take or pass them. This was a consent decree entered after compliance with rules relating to notice and other provisions for disposition of class actions and was in accordance with the holding of several courts, Brotherhood of Locomotive Firemen and Enginemen v. Palmer, supra; Hinton v. Seaboard Air Line R. Co., supra; Rolax v. Atlantic Coast Line R. Co., supra, to the effect that the Brotherhood's proposal of January 26, 1948 was unfair to Negro firemen who had done back-breaking firing for several decades with no thought of, or prospect for, promotion to engineer. One of these Negro firemen, testifying in the case of Mitchell v. Gulf, Mobile & Ohio R. Co., D.C.N.D. Ala., W.D.1950, 91 F.Supp. 175, 182, on being asked if he wanted to become an engineer, replied that it was just "too late in the evening" for him to become an engineer.

The 1954 contract contains the same provisions relating to forced promotion and penalty as the 1944 contract. The restriction and its consequences are scheduled to continue. The carrier and Brotherhood officials who negotiated and agreed upon the forced promotion rule and penalty restriction complained of are all dead with the exception of Mr. W. J. Collins, Director of Personnel of the carrier.

Restriction to yard firing is an advisable railroad operational requirement to provide for the training and maintenance of an adequate supply of qualified road engineers, inasmuch as road firing constitutes an essential experience for future road engineers and also an employment opportunity for desirable prospective engineers until such time as regular employment as engineers is possible. The restriction is a portion of the forced promotion rule requiring promotable firemen to take the examination for road engineer, and the forced promotion rule has become an established practice on the majority of the larger railroads of the United States. The restriction on this particular carrier for failure to pass or take the examination is more lenient than the restriction applicable generally on other railroads. In the absence of such restrictions firemen who could never become engineers would eventually preempt a great number of the road firing jobs, thereby lessening the opportunity for adequate training for prospective road engineers.

The thirteen plaintiffs represent a small minority of the men involved in the examinations, only some fifteen or twenty now being restricted out of approximately three hundred and sixty-eight white engineers. There was a shortage of engineers during World War II when the penalty was lessened from dismissal to restriction.

No Negro fireman junior to three of the plaintiffs, Biles, Joiner and Bare-

field, has occupied road firing runs in their district. A fourth plaintiff, Franklin, did not appear at the trial and did not substantiate his claim to being adversely affected.

The Brotherhood is composed entirely of white personnel and all officials of the carrier are white.

Of the thirteen plaintiffs, none filed suits within four years from the date the restrictive feature took effect in the agreement of 1944. Only three filed suits within four years from the date of their actual restriction, these being Dooley, Lowery and Bateman. None of the plaintiffs ever complained to the Brotherhood or to the carrier of the restrictive provisions themselves, as distinguished from their having been restricted thereunder.

The 1944 agreement provides in Article 26, Section 14(a) that "a statute of limitation of one year is hereby fixed for the handling by appeal, or otherwise, of any case involving seniority. If one year has elapsed without any written protest being filed, it cannot be handled by the committee or by the company, except as provided in Section 11(b) of this Article." Only one of the plaintiffs, Bateman, can be said to have filed any written protest within one year, his restriction being within one year of the filing of this suit. Several of the plaintiffs made oral complaints to Brotherhood Chairman Flowers, now deceased, and also to defendant carrier, some within one year and some much later. Some of them were told in response to their complaints that the contract was clear, and nothing could be done about it.

All of these plaintiffs have, from time to time, been members of the Brotherhood. All except Williams, Franklin, Lowery, Biles and Bateman were members when they were restricted. None of the plaintiffs were members on January 1, 1954, when the existing collective agreement became effective.

The Brotherhood constitution provides that any member who has a grievance against it in connection with its representation of its members' interest with the employer may resort to a system of appeal within the Brotherhood for redress, and said constitution denies resort to the civil courts to correct or redress any such grievance or to secure any alleged rights against it until such member shall first have exhausted all remedy by appeal provided by said constitutional provisions. None of these plaintiffs took any such action.

In the light of the facts of this case, which this court finds to be as above stated, we must examine the plaintiffs' contentions that the Brotherhood "did not fairly and equitably bargain or act for or on behalf of all members of the class or craft affected by such negotiations * * *"; that by reason of the agreements aforesaid these white plaintiffs "are discriminated against because they are white persons"; that the Brotherhood and the carrier conspired to enter into such agreements, and that "the said agreements were intended to and did operate to the serious injury" of the plaintiffs and others similarly situated.

The court finds further that the carrier has traditionally and consistently discriminated against the Negroes in the matter of promotability. The Brotherhood's explanation and attempted justification of this discrimination is stated forthrightly in its brief in this case as follows:

"The position occupied by the Negro firemen and the problems created thereby for both the Negro fireman and the White fireman can surely be viewed at this time with candor and fairness. Negroes have for generations been employed in substantial numbers as firemen by the southeastern railroads. Management employed the Negro with no expectation that he would ever be advanced to the position of engineer, for there were sociological considerations against placing a Negro in command of a train that no suc-

cessful railroad management could flout.

"The White fireman was employed with the full realization that his counter-part, the Negro fireman, was to remain a fireman and hence would not become his superior and master through the process of promotion to the commanding position of engineer. At the same time, the White fireman entered upon his employment cognizant of a fact known throughout the railway industry, that his status as fireman was but a training ground for his eventual assumption of the responsibilities of engineers.

"The Negro was not misled, for he took up the employment of fireman with no less an understanding than that held by management and by the White firemen regarding the limitations imposed upon his employment by his social environs.

"These are factual conclusions that no man having even a passing acquaintance with the railway industry has failed to understand. They are facts that railroad men accepted, or yielded to, as elemental and perhaps permanent."

Apparently, that discrimination as to promotability has not been attacked in the courts. The attack in the series of cases headed by Steele v. L. & N. R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and Tunstall v. Brotherhood, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, was aimed at the further discrimination attempted by the Southeastern Conference Agreement of February 18, 1941, which provided in part that on each railroad the proportion of nonpromotable firemen should not exceed fifty per cent, and that until such percentage was reached only promotable firemen would be hired. This extension of discrimination was prevented by the courts. Judge Parker, writing for the Fourth Circuit Court of Appeals in the case of Brotherhood of Locomotive Firemen and Enginemen v. Tunstall, supra [163 F.2d 293], said:

"The fact that the railroads have discriminated against Negroes in the matter of promotability, does not justify the Brotherhood, which represents them as bargaining agent, in making a further discrimination based on that discrimination. Because the railroads do not permit Negroes to hold the position of engineer, is no reason why a bargaining agent representing them should use its bargaining power to deprive them of desirable positions as firemen which the railroads do permit them to hold."

In the Steele and Tunstall cases relied upon by plaintiffs, an all white Brotherhood, charged under the law with the legal duty of bargaining fairly and impartially for all firemen, including nonmember Negro firemen, was accused of, and found to be, practicing intentional discrimination against the Negro firemen because of their race. This case, however, presents a different picture. As was said in the ruling on the motion to dismiss in this case: "Here, we have the novel situation of alleged racial discrimination within one race." It will not be presumed that an all white Brotherhood discriminated against its own members, or erstwhile members, on account of their being members of the white race. The evidence is entirely insufficient to show such discrimination. Discrimination is normally aimed at identifiable individuals or groups. When the dismissal provision was agreed upon in 1941 and when its ameliorated counterpart was agreed upon in 1944, the Brotherhood and carrier may have assumed that some unknown firemen would not successfully pass the examinations and would, therefore, be adversely affected by these contractual provisions, but they had no way of knowing who such unsuccessful persons would be. They knew only that they would be white men because only white men were re-

quired, or permitted, to qualify by examination for promotion to engineer.

The white firemen, including these plaintiffs, have made, and now make, no complaint against the basic discrimination against the Negro firemen. Indeed, the white firemen, including eleven of the plaintiffs, have reaped the benefit of that discrimination by standing for promotion to the position of engineer, a position denied to the Negroes. Now, eleven of the plaintiffs having failed the examination, and two being unwilling to attempt it, say that they are discriminated against because the favoritism which was shown to them, and which they accepted without complaint, had attached to it a measure of inconvenience.

■ The sound doctrine of the Steele case is that the Brotherhood is under a "duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them", but the Supreme Court, as if to answer in advance the arguments of these plaintiffs, quickly added: "This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit." [323 U.S. 192, 65 S.Ct. 232.]

The question here is not whether these contracts have "unfavorable effects on some of the members of the craft represented." The Supreme Court has said in the Steele case that such circumstances standing alone will not vitiate a col-

lective bargaining agreement. See also Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048, and Aeronautical Industrial District Lodge 727 v. Campbell, 1949, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513. The question here is whether the Brotherhood has practiced hostile discrimination against these plaintiffs and whether the carrier has conspired with the Brotherhood so to do. Judge Parker, writing for the Fourth Circuit in the case of Rolax v. Atlantic Coast Line R. Co., 4 Cir., 1950, 186 F.2d 473, 477, said: "It is proper, of course, for the defendant railroad to adopt such rules regarding the service of firemen as are necessary to provide experience for the training of engineers and to enter into agreements with the Brotherhood representing the firemen with regard thereto * * *."

■ It did not constitute a hostile discrimination against such white firemen as might refuse to take, or fail to pass, the examination to discriminate in favor of all white firemen by permitting all of them to stand the examination and by promoting to the position of engineer all who successfully passed, restricting to yard duty (yard firing and yard engineering) those who refused to take, or failed to pass, the examination. These agreements provided for all white firemen a package deal which must be viewed in its entirety. One sailing downstream, thus enjoying the favorable current, cannot gracefully complain of the comparatively minor eddies and whirlpools.

Finding no hostile or unlawful discrimination against these plaintiffs and no conspiracy on the part of any of the defendants for such discrimination, the court finds it unnecessary to consider the other defenses. The plaintiffs are not entitled to any of the relief sought, and an appropriate decree may be prepared and presented, taxing costs against the plaintiffs.